**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**Nos. 16-1028, 16-1063 & 16-1064**

_____

# In the United States Court of Appeals
# For the District of Columbia Circuit

_____

BROWNING-FERRIS INDUSTRIES OF CALIFORNIA, INC.,
DOING BUSINESS AS BFI NEWBY ISLAND RECYCLERY,
PETITIONER/CROSS-RESPONDENT

*v.*

NATIONAL LABOR RELATIONS BOARD
RESPONDENT/CROSS-PETITIONER

AND

INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL 350
INTERVENOR

_____

*ON PETITION FOR REVIEW AND CROSS-PETITION FOR ENFORCEMENT
OF ORDERS OF THE NATIONAL LABOR RELATIONS BOARD*

_____

**FINAL BRIEF OF PETITIONER/CROSS RESPONDENT
BROWNING-FERRIS INDUSTRIES OF CALIFORNIA, INC.**

STUART NEWMAN                MICHELE L. ODORIZZI
JOSHUA L. DITELBERG          MAYER BROWN LLP
ALEX MEIER                   *71 S. Wacker Drive*
BRYAN BIENIAS                *Chicago, IL 60606*
KAITLYN F. WHITESIDE         *(312) 782-0600*
SEYFARTH SHAW LLP            *(312) 782-0600*
      *1075 Peachtree Street, NE*
      *Suite 2500*
      *Atlanta, GA 30309-3962*
      *(404) 885-1500*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for Petitioner/Cross-Respondent Browning-Ferris Industries of California, Inc. doing business as BFI Newby Island Recyclery[1], certifies the following:

**(A)    Parties, Intervenors, and Amici**    The parties are Petitioner/ Cross-Respondent Browning-Ferris Industries of California, Inc. doing business as BFI Newby Island Recyclery and Respondent/Cross-Petitioner National Labor Relations Board. The Intervenor is Sanitary Truck Drivers and Helpers Local 350, International Brotherhood of Teamsters.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioner/Cross-Respondent Browning-Ferris Industries of California, Inc. certifies the following:

Browning-Ferris Industries of California, Inc. is a California corporation engaged in non-hazardous solid waste management.

Browning-Ferris Industries of California, Inc. is a wholly owned subsidiary of Browning-Ferris Industries, LLC.

Browning-Ferris Industries, LLC is a wholly owned subsidiary of Allied Waste North America, LLC.

---

[1]    The docket inadvertently refers to "Recycling" instead of "Recyclery" as part of Petitioner/Cross-Respondent's name.

i

Allied Waste North America, LLC is a wholly owned subsidiary of Allied Waste Industries, LLC.

Allied Waste Industries, LLC is a wholly owned subsidiary of Republic Services, Inc., which is a publicly owned corporation.

Allied Waste Industries, LLC has no parent corporation, and no publicly owned company owns 10% or more of its stock.

**(B)    Rulings Under Review**        The rulings under review in this case are (1) the Decision and Order of the Board in Case 32-CA-160759 on January 12, 2016 and reported at 363 NLRB No. 95; and (2) the Decision on Review and Direction of the Board in Case 32-RC-109684 on August 27, 2015 and reported at 362 NLRB No. 186. Review of the Board's Decision and Order in Case 32-CA-160759 includes review of the Decision on Review and Direction in the underlying representation proceeding, Case 32-RC-109684.

**(C)    Related Cases**        Browning-Ferris Industries of California, Inc. is unaware of any related case involving substantially the same parties and the same or similar issues.

s/ Stuart Newman
Stuart Newman

## STATEMENT REGARDING JOINT APPENDIX

Pursuant to Federal Rule of Appellate Procedure 30(c) and Circuit Rule 30(c), counsel for the parties have consulted and agreed to use a deferred joint appendix.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

STATEMENT REGARDING JOINT APPENDIX ................................................. iii

TABLE OF AUTHORITIES ............................................................................ vii

GLOSSARY OF ABBREVIATIONS ................................................................ xii

INTRODUCTION ..............................................................................................1

JURISDICTION ................................................................................................1

ISSUES PRESENTED........................................................................................2

STATUTES INVOLVED ...................................................................................3

STATEMENT OF THE CASE............................................................................3

        A.    Background ........................................................................3

              1.    The Relationship Between Browning-Ferris And Leadpoint ................................................................3

              2.    Leadpoint Controls Hiring Determinations ......................4

              3.    Leadpoint Controls Employee Compensation..................4

              4.    Leadpoint Controls The Day-To-Day Work Of Its Employees...................................................................5

              5.    Leadpoint Controls Its Employees' Schedules................7

        B.    Procedural History .......................................................8

              1.    The Union's Representation Petition..............................8

              2.    The Regional Director's Decision ..................................8

              3.    Proceedings Before The Board........................................9

SUMMARY OF ARGUMENT ...........................................................................10

STANDING .......................................................................................................13

STANDARD OF REVIEW .................................................................13

ARGUMENT ...................................................................................16

    I.    THE NLRB'S NEW JOINT-EMPLOYER TEST FAILS AS A
    MATTER OF LAW ..................................................................16

        A.    The Board's Prior Joint-Employer Test.....................................16

        B.    The Board's New Joint-Employer Test ......................................19

        C.    The Board's New Joint-Employer Test Is Contrary To
            The Employment Relationships Recognized By Congress
            In The 1947 Taft-Hartley Amendments To The NLRA ...........21

            1.    The Board's test is contrary to Congress' intent
                  that direct and immediate control is necessary to an
                  employment relationship under the Act ........................21

            2.    The Board's test is inconsistent with this Court's
                  analysis of who constitutes an "employee" under
                  the Act ........................................................................27

            3.    The Board's reliance upon the Third Circuit's
                  *Browning-Ferris* approach is misplaced ......................32

            4.    The Board's test is contrary to the treatment of
                  employment relationships in Taft-Hartley's
                  secondary boycott provisions ........................................33

        D.    The Board's New Joint-Employer Test Relies Upon An
            Assessment Of "Economic Realities" Which Congress
            Prohibited In Enacting The Taft-Hartley Amendments...........37

            1.    The Board's revisionist project is driven by
                  impermissible economic considerations........................37

            2.    The Board's rendering of its new test involves a
                  prohibited reliance upon "economic realities" ..............41

        E.    The Board's New Joint-Employer Test Fails To Promote
            Stable Collective Bargaining Relationships As Required
            By The Act ...............................................................................47

II.  THE NLRB's NEW JOINT EMPLOYER TEST IS
     ARBITRARY AND CAPRICIOUS ....................................................53

III.  BROWNING-FERRIS IS NOT A JOINT EMPLOYER
      UNDER EITHER THE LONGSTANDING TEST THE NLRB
      ABANDONED IN THIS CASE OR ITS NEW TEST ......................56

IV.  EVEN IF THE BOARD'S NEW JOINT-EMPLOYER TEST IS
     CONSISTENT WITH THE NLRA, IT IS INEQUITABLE TO
     APPLY ITS REVERSAL OF 30 YEARS OF PRECEDENT
     TO BROWNING-FERRIS ................................................................57

CONCLUSION ....................................................................................58

CERTIFICATE OF COMPLIANCE ....................................................59

CERTIFICATE OF SERVICE ............................................................60

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFTRA, Washington-Baltimore Local v. NLRB*,
  462 F.2d 887 (D.C. Cir. 1972)........................................................34

*Airborne Express*,
  338 NLRB 597 (2002) ...........................................................17, 19

Allied Chem. & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate
  Glass Co.,
  404 U.S. 157 (1971)...............................................................25, 47

AM Prop. Holding Corp.,
  350 NLRB 998 (2007) .......................................................17, 18, 19

Am. Ship Bldg. Co. v. NLRB,
  380 U.S. 300 (1965).................................................................38

Antelope Valley Press,
  311 NLRB 459 (1993) ...............................................................52

*Auciello Iron Works, Inc. v. NLRB*,
  517 U.S. 781 (1996)..................................................................47

*Aurora Packing Co. v. NLRB*,
  904 F.2d 73 (D.C. Cir. 1990)......................................................14, 27

Boire v. Greyhound Corp.,
  376 U.S. 473 (1964)..................................................................23

Boise Cascade Corp. v. NLRB,
  860 F.2d 471 (D.C. Cir. 1988)......................................................47

Carpenters & Millwrights, Local Union 2471 v. NLRB,
  481 F.3d 804 (D.C. Cir. 2007).......................................................16

_____

\* Authorities upon which we chiefly rely are marked with asterisks. D.C. Cir.
R. 28(a)(2).

*Chevron USA Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)..................................................................12, 14, 15

*Cmty. for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989)..........................................................................16, 26

*Colgate-Palmolive-Peet Co. v. NLRB*,
    338 U.S. 355 (1949)..................................................................................47

*Computer Assocs. Int'l, Inc.*,
    324 NLRB 285 (1997) ............................................................................52

*Epilepsy Found. of Ne. Ohio v. NLRB*,
    268 F.3d 1095 (D.C. Cir. 2001)............................................................58

*Fall River Dyeing & Finishing Corp. v. NLRB*,
    482 U.S. 27 (1987)....................................................................................40

*FDA v. Brown & Williamson Tobacco Corp*.,
    529 U.S. 120 (2000)............................................................................33, 40

*\*FedEx Home Delivery v. NLRB*,
    563 F.3d 492 (D.C. Cir. 2009).........................................................30, 31

*Fibreboard Paper Prods. Corp. v. NLRB*,
    379 U.S. 203 (1964)..................................................................................44

*First Nat'l Maint. Corp. v. NLRB*,
    452 U.S. 666 (1981)..................................................................................55

*Goodyear Tire & Rubber Co*.,
    312 NLRB 674 (1993) ............................................................................18

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)..................................................................................16

*H. K. Porter Co. v. NLRB*,
    397 U.S. 99 (1970)....................................................................................38

*Hill v. Colorado*,
    530 U.S. 703 (2000)............................................................................15, 16

*Hychem Constructors, Inc.*,
     169 NLRB 274 (1968) .................................................................44

*Int'l Alliance of Theatrical & Stage Emps., Local 39 v. NLRB*,
     334 F.3d 27 (D.C. Cir. 2003).....................................................15

*Int'l Chem. Workers Union Local 483 v. NLRB*,
     561 F.2d 253 (D.C. Cir. 1977).....................................................56

*Int'l Longshoremen's Ass'n v. NLRB*,
     56 F.3d 205 (D.C. Cir. 1995).......................................................14

*Kelley v. So. Pac. Co.*,
     419 U.S. 318 (1974).............................................................26, 27

*\*Laerco Transp.*,
     269 NLRB 324 (1984) ........................................9, 17, 18, 19, 27, 56

*Lancaster Symphony Orchestra v. NLRB*,
     882 F.3d 563 (D.C. Cir. 2016)................................................14, 27

*\*Local 777, Democratic Union Org. Comm., Seafarers Int'l Union of
     N. Am.*,
     603 F.2d 862 (D.C. Cir. 1978), *reh'g denied*, 603 F.2d 891
     (D.C. Cir. 1979) ........................................ 26, 27, 28, 29, 30, 38, 40

*Lodge 1858, Am. Fed'n of Gov't Emps. v. Webb*,
     580 F.2d 496 (D.C. Cir. 1978)...................................................27

*Nationwide Mut. Ins. Co. v. Darden*,
     503 U.S. 318 (1992)..........................................................16, 23, 26

*NLRB v. Wooster Div. of Borg-Warner Corp.*,
     356 U.S. 342 (1958)...............................................................50, 52

*\*NLRB v. Browning-Ferris Industries of Pennsylvania., Inc.*,
     691 F.2d 1117 (3d Cir. 1982) ...................................17, 18, 19, 32, 36

*\*NLRB v. Denver Bldg. & Constr. Trades Council*,
     341 U.S. 675 (1951)....................................................................35

*\*NLRB v. Hearst Publications*,
     322 U.S. 111 (1944)....... 10, 11, 22, 23, 28, 37, 38, 39, 40, 41, 42, 43, 45, 46, 47

ix

*NLRB v. Town & Country Elec., Inc.*,
  516 U.S. 85 (1995)...................................................................................16

*NLRB v. United Ins. Co.*,
  390 U.S. 254 (1968)....................................................................12, 14, 23

*N. Am. Van Lines, Inc. v. NLRB*,
  869 F.2d 596 (D.C. Cir. 1989)....................................................28, 29, 57

*Pac. Nw. Newspaper Guild, Local 82 v. NLRB*,
  877 F.2d 998 (D.C. Cir. 1989).........................................................15, 55

Plumbers Local 447 (Malbaff Landscape Constr.),
  172 NLRB 128 (1968) ........................................................................52

Radio City Music Hall Corp. v. United States,
  135 F.2d 715 (2d Cir. 1943) ...............................................................26

*Shenker v. Baltimore & Ohio R. Co.*,
  374 U.S. 1 (1963)...............................................................................26

So. Cal. Gas Co.,
  302 NLRB 456 (1991) .........................................................................19

Standard Oil Co. v. Anderson,
  212 U.S. 215 (1909)............................................................................26

Titanium Metals Corp. v. NLRB,
  392 F.3d 439 (D.C. Cir. 2004).............................................................14

*TLI, Inc.*,
  271 NLRB 798 (1984) ........................................9, 17, 18, 19, 27, 56

W.W. Grainger, Inc.,
  286 NLRB 94 (1987) *enf. den.*, 860 F.2d 244 (7th Cir. 1988) ...........51

W&M Props. of Conn., Inc. v. NLRB,
  514 F.3d 1341 (D.C. Cir. 2008)....................................................13, 14

**Statutes**

5 U.S.C. § 706(2) ...............................................................................13

29 U.S.C. § 151(1) ............................................................................39

29 U.S.C. § 152(2) ...............................................................12, 16, 23

29 U.S.C. § 152(3) ...............................................................10, 22

29 U.S.C. § 152(11) ..........................................................................25

29 U.S.C. § 154(a) ............................................................................38

29 U.S.C. § 158(a)(2) ........................................................................49

29 U.S.C. § 158(a)(3) ........................................................................52

29 U.S.C. § 158(a)(5) ........................................................................49

29 U.S.C. § 158(b)(4) ...............................................................34, 35

29 U.S.C. § 158(b)(4)(ii)(B) .............................................................33

29 U.S.C. § 158(d) ............................................................................50

29 U.S.C. §§ 191-197........................................................................41

1947 Taft-Hartley Amendments
    Pub. L. 81-101...........2, 10, 12-13, 21-23, 25-26, 28, 33-34, 37-41, 43-47, 53-54

1959 Landrum-Griffin Amendments Pub. L. 86-257 .............................34

**Other Authorities**

*H.R. Rep. No. 245, 80th Cong., 1st Sess., 18 (1947) ....................25, 38

Recommended Practices, available at
    https://www.osha.gov/Publications/OSHA3735.pdf...........................6

Restatement (Second) of Agency Section 220 ...............................24, 27

Restatement (Second) of Agency Section 227 ...................................24

# GLOSSARY OF ABBREVIATIONS

Administrative Procedures Act (APA)

Browning-Ferris Industries of California, Inc. doing business as BFI Newby Island Recyclery (Browning-Ferris)

Leadpoint Business Services (Leadpoint)

National Labor Relations Act, as amended, 29 U.S.C. § 151 *et seq*. (NLRA or Act)

National Labor Relations Board (Board)

Occupational Health and Safety Administration (OSHA)

National Labor Relations Board Regional Director Decision (RD)

Sanitary Truck Drivers and Helpers Local 350, International Brotherhood of Teamsters (Local 350)

1947 Taft-Hartley Amendments, Pub. L. 81-101 (Taft-Hartley)

# INTRODUCTION

Applying well-settled law to the facts following a hearing, a Regional Director of the Board found that Browning-Ferris was not a joint employer of the employees of one of its contractors, Leadpoint.

On review, the Board, in a 3-2 decision, abandoned the test it established over 30 years ago for determining whether a joint-employer relationship exists for purposes of the NLRA. It adopted a new, much more expansive standard under which indirect control or even an unexercised potential right to control key employment terms alone — without any evidence of direct and immediate control — can establish joint-employer status. The Board concluded that its new test should be applied retroactively and held that Browning-Ferris and Leadpoint jointly employ Leadpoint's employees.

# JURISDICTION

Following the Board's Decision on Review and Direction issued on August 27, 2015, on September 4, 2015, an election was held, and Local 350 became certified as bargaining representative for the petitioned-for unit. After Browning-Ferris refused to bargain in order to pursue review of the new joint-employer standard, on January 12, 2016, the Board issued its final Decision and Order requiring Browning-Ferris to recognize Local 350. JA-424. The Decision and

Order incorporated the Board's August 27, 2015 Decision on Review and Direction. JA-424-425.

On January 20, 2016, Browning-Ferris filed a timely petition for review of the Board's January 12, 2016 Decision and Order (including its earlier Decision on Review and Direction). On February 25, 2016, the Board cross-petitioned for enforcement. This Court has jurisdiction pursuant to 29 U.S.C. § 160(e)-(f).

## ISSUES PRESENTED

1. Whether the Board's new joint-employer test fails as a matter of law because:

a. it is contrary to the employment relationships recognized by Congress in the 1947 Taft-Hartley amendments to the National Labor Relations Act, as amended, 29 U.S.C. § 151 *et seq.*;

b. it relies upon the kind of assessment of "economic realities" prohibited in the Taft-Hartley amendments;

c. it fails to promote stable collective bargaining relationships as required by the NLRA.

2. Alternatively, whether the NLRB's new test is arbitrary and capricious because it overturns decades of settled law and imposes a joint-employer definition so broad and unconstitutionally vague that it is impossible for parties to arrange their affairs to achieve predictable legal outcomes.

2

3.     Whether Browning-Ferris is a joint employer under either the longstanding test the Board abandoned in this case or its new test.

4.     If the Board's new test is valid, whether it is equitable to retroactively apply its reversal of 30 years of precedent to Browning-Ferris.

## STATUTES INVOLVED

Relevant statutory provisions are set forth in the addendum to the brief.

## STATEMENT OF THE CASE

### A.     Background

#### 1.     *The Relationship Between Browning-Ferris And Leadpoint*

Browning-Ferris provides solid waste and recycling services for commercial, industrial, municipal and residential customers. It owns the Newby Island recyclery in Milpitas, California, which processes approximately 1,200 tons per day of mixed materials, waste, and recyclables. JA-370.

Browning-Ferris has contracted with Leadpoint for it to operate a portion of the Newby Island facility which includes three functions: sorting, screen cleaning, and housekeeping. Sorters separate out recyclables and prohibited materials. Screen cleaners monitor the material lines and remove any jams. Housekeepers clean the areas around the material lines. These positions, with one exception, are staffed entirely by Leadpoint personnel.[2] JA-344-345.

---

[2]     One Browning-Ferris employee works as a sorter; she elected this position during a reduction-in-force. JA-371 n.11; JA-72, 126.

Leadpoint is an independent business whose ownership and management is wholly separate from Browning-Ferris'. Leadpoint does not merely supply labor to its clients, but manages all employment-related matters. Through its own on-site management team and its human resources personnel, Leadpoint has direct, immediate, and exclusive control over recruiting, applicant screening, hiring, training, supervising, scheduling, compensating, counseling, promoting, disciplining and terminating its employees at the Newby Island facility. JA-344-356. *See also* JA-39-49, 60-70, 72, 118-123, 135-138, 140, 141, 168-169, 171-172, 200-206, 213-214, 234-239, 242-244, 256-257, 343.

### 2. *Leadpoint Controls Hiring Determinations*

Browning-Ferris has no involvement with Leadpoint's recruiting, applicant screening, or hiring. Leadpoint does not require Browning-Ferris' approval to hire or place an employee at the recyclery. Leadpoint alone tests each applicant's skills using its own grading system, and does not share applicant performance data with Browning-Ferris. JA-60-62, 105, 115-116, 136, 168-169, 200-201, 242-244.

### 3. *Leadpoint Controls Employee Compensation*

Leadpoint has sole authority to determine the wage rates for the employees who perform services for Browning-Ferris, except that Leadpoint cannot raise its wages in excess of those paid by Browning-Ferris to its own full-time employees

4

who perform similar duties without first obtaining consent. JA-91, 183, 189-190, 201-202, 217-218.

Based on the number of hours its employees work, Leadpoint sends Browning-Ferris an invoice, which details its employees' names, positions, and wage rates. Browning-Ferris then pays Leadpoint the amount owed under the parties' "cost-plus" arrangement. JA-181-182.

Leadpoint's benefits are administered by its human resources department, and it offers its employees its own healthcare and other benefit plans. JA-68-70, 202.

### 4.  *Leadpoint Controls The Day-To-Day Work Of Its Employees*

Leadpoint employees maintain four material lines at Newby Island by sorting and removing materials in the stream and cleaning around the sorting areas. Browning-Ferris decides when the lines will run and the lines' speed, based on the volume and categories of material at the recyclery on a particular day. However, Leadpoint supervisors oversee its employees and decide what duties they will perform on the lines. Leadpoint monitors and polices its employees' work to ensure their performance complies with Leadpoint-created "Standards of Work." JA-39-49, 60, 77-78, 105, 115, 126, 135, 142-143, 165, 234-239, 256-257.

Leadpoint employees typically have limited interactions with Browning-Ferris personnel. When Leadpoint employees arrive at work, they check in at the

Leadpoint administrative trailer, and Leadpoint supervisors ensure they comply with safety requirements, such as wearing Leadpoint-supplied personal protective equipment.[3] Leadpoint supervisors then hold meetings with its employees before work begins. JA-63, 64, 70, 112, 120, 200, 204-205, 232, 255-256.

Leadpoint directs its employees to a particular work station and supervises them. Browning-Ferris personnel rarely enter this area. When Leadpoint employees have questions or concerns during a shift, they go to Leadpoint supervisors, who address problems without Browning-Ferris' intervention. Leadpoint — not Browning-Ferris — instructs its employees on sorting quality and speed, and manages the cleanliness of areas around sorting stations. JA-67, 70-72, 120-121, 140, 183-184, 231, 235, 253-254, 331.

At the end of a shift, Leadpoint employees sign out in a different area from Browning-Ferris personnel. Leadpoint supervisors then review its employees' productivity in view of Leadpoint's standards.[4] JA-70.

---

[3]     Browning-Ferris and Leadpoint collaborate on communicating general safety requirements consistent with OSHA guidelines which encourage such collaboration at multi-employer worksites. *See* Recommended Practices, available at https://www.osha.gov/Publications/OSHA3735.pdf (accessed 11/6/2016). JA-107.

[4]     Occasionally, Browning-Ferris supervisors have had direct interaction with Leadpoint employees, but they did not involve an exercise of control. JA-137, 171, 205-206, 212-213. In one instance, a Browning-Ferris supervisor told a Leadpoint supervisor that he had observed two Leadpoint employees passing a bottle of whiskey while on the job. Leadpoint made its own decision to discharge one of the

Leadpoint has its own employment policies, which are different from those applicable to Browning-Ferris' personnel. JA-62-63, 203-204, 213-214.

###### 5.    *Leadpoint Controls Its Employees' Schedules*

Leadpoint's on-site manager makes schedule determinations regarding its employees. A Leadpoint employee who wants a different shift brings their concern to Leadpoint, not Browning-Ferris. JA-119, 138, 233, 309-310.

When Browning-Ferris anticipates that time outside normal shifts might be required to clear a line, it informs Leadpoint supervisors about the expected overrun. Leadpoint then decides who stays and works overtime. Browning-Ferris does not make overtime determinations and does not know which Leadpoint workers will continue working. JA-33, 68-70, 77-78, 109, 130, 181, 192.

---

employees and re-assign the other one to a different contract, without any input from Browning-Ferris. JA-137, 171, 205-206, 212-213, 349-351 . On another occasion, a Browning-Ferris supervisor told Leadpoint management that he had seen a Leadpoint employee on surveillance video damaging Browning-Ferris' property. Leadpoint conducted an investigation and ultimately decided to terminate the employee, again without Browning-Ferris' input. JA-240-242. There also was evidence of isolated instances where Browning-Ferris supervisors discussed Leadpoint employees' performance directly with them. For example, one sorter asserted that she had seen a Browning-Ferris supervisor instruct a Leadpoint employee "a couple times" over a two-to-three year period. Another employee recalled that a Browning-Ferris supervisor once reminded Leadpoint employees to keep their work areas clean but to not use their break time cleaning up the sorting area. JA-315, 325-237, 338.

### B.    Procedural History

#### 1.    *The Union's Representation Petition*

On July 22, 2013, Local 350 filed a petition with the Board seeking a representation election for a bargaining unit comprised of all full- and part-time sorters, housekeepers, and screen cleaners at Newby Island. In its petition, Local 350 alleged that Browning-Ferris and Leadpoint were joint employers of the petitioned-for employees.

#### 2.    *The Regional Director's Decision*

After an evidentiary hearing, on August 16, 2013, the Regional Director of Board Region 32 determined that Leadpoint was the sole employer of its employees. Evaluating the facts under the joint-employer analysis the Board had applied for the past 30 years, the Regional Director concluded that Leadpoint controlled its own employees' wages, benefits, day-to-day supervision, schedules, hiring, and discipline/termination. JA-346, 359-361. In contrast, the Regional Director found that Browning-Ferris did not "share, or co-determine [with Leadpoint] those matters governing the essential terms of employment" for Leadpoint's housekeepers, sorters, or screen cleaners, and thus could not be deemed a joint employer. JA-61-363.

### 3.    *Proceedings Before The Board*

The Board granted Local 350's request for review of the Regional Director's decision. The Board invited the parties and interested *amici* to file briefs addressing the following questions:

1.    Under the Board's current joint-employer standard, as articulated in *TLI, Inc.*, 271 NLRB 798 (1984) . . . and *Laerco Transportation*, 269 NLRB 324 (1984), is Leadpoint Business Services the sole employer of the petitioned-for employees?

2.    Should the Board adhere to its existing joint-employer standard or adopt a new standard? What considerations should influence the Board's decision in this regard?

3.    If the Board adopts a new standard for determining joint-employment status, what should that standard be? If it involves the application of a multifactor test, what factors should be examined? What should be the basis or rationale for such a standard?

JA-369.

On August 27, 2015, in a 3-2 Decision on Review and Direction, the Board "decided to restate the Board's legal standard for joint employer determinations and make clear how that standard is going to be applied going forward." JA-383. The Board's new test no longer required that a joint employer exercise direct and immediate control over key employment terms. Rather, the majority held that indirect control over such terms or even an unexercised potential right to control also are probative of joint-employer status, and may be determinative. JA-370.

9

Applying its new test to Browning-Ferris here, the Board concluded that it was a joint employer of Leadpoint's employees because it found "the facts demonstrate that it shares or codetermines those matters governing the essential terms and conditions of employment for the Leadpoint employees." JA-386.

## SUMMARY OF ARGUMENT

In its 1947 Taft-Hartley amendments, Congress changed the "employee" definition in Section 2(3) of the NLRA, 29 U.S.C. § 152(3), to overcome the Supreme Court's holding in *NLRB v. Hearst Publications*, 322 U.S. 111 (1944). The *Hearst* Court had declined to apply what it acknowledged to be the "traditional" common law test for determining an employer-employee relationship: "[c]ontrol of 'physical conduct in the performance of the service,'" *i.e.*, direct and immediate control. *Id.* at 128 n.27 (citation omitted). Instead, the Court concluded that Congress meant the term to have a broader meaning, based upon an assessment of the "economic realities" underlying the relationship.

Congress unequivocally rejected the Supreme Court's analysis. In legislative history the Court subsequently found to reflect the intent of the Taft-Hartley amendments, Congress made clear that the "employee" definition is to be grounded in a common-law assessment. Importantly, Congress emphasized that the governing standard's essential requirement is "direct supervision," *i.e.*, direct and immediate control.

10

Since 1947, Congress has not further modified the NLRA's treatment of employment relationships. Despite this constancy, in this case, the Board ignored Congress' directive and rejected 30 years of its own precedent, which had clarified its previously inconsistent joint-employer cases. In a 3-2 decision, the Board fashioned a new test which omits any requirement that a putative joint employer have direct and immediate control over essential employment terms. The Board's test provides that indirect control alone over such terms or even an unexercised potential right to control may be dispositive in establishing joint-employer status. The new test also improperly treats the "limited and routine" user oversight inherent in administering a service or contractor arrangement as a basis for a joint-employer finding. And it confuses a client's <u>influence</u> upon a <u>service provider</u> due to market forces, pricing limitations, and customer criteria (*i.e.,* "economic realities") with actual day-to-day <u>control</u> over the provider's <u>employees</u>.

As Congress considered the newspaper distributors in *Hearst* to be contractors, it surely would regard Browning-Ferris to have a similar relationship to Leadpoint's employees. Leadpoint is a typical service provider. It is a wholly separate business from Browning-Ferris, with independent ownership and administration. It manages its employees to deliver contracted services within an entrepreneurial framework.

11

*Chevron* does not apply to the Board's interpretation of the common law. The Supreme Court has emphasized that "a determination of pure agency law [*i.e.*, the common law of agency] involve[s] no special administrative expertise that a court does not possess." *NLRB v. United Ins. Co.*, 390 U.S. 254, 260 (1968). The common law is judicially crafted law, and the Board thus is entitled to no deference here. Indeed, the Board's new test is inconsistent with this Court's own understanding that: (1) direct and immediate control of key employment terms is critical to an employer finding under the NLRA; and (2) a client's economic or other influence upon a service provider in arranging its business does not constitute control over its employees.

Not only is the Board's new test contrary to Congress' meaning that the *sine qua non* of an employment relationship is direct and immediate control, it is also inconsistent with the NLRA in other fundamental respects. Section 2(2), 29 U.S.C. § 152(2), established a unitary "employer" definition to comport with all of the Act's designs. Applying the Board's new test would impermissibly weaken the range of employers covered by the Act's secondary boycott protections. Such protections were enacted by Taft-Hartley along with its narrowing of the "employee" definition back to a requisite of direct and immediate control. The Board's test also destabilizes the structure of collective bargaining contemplated by Congress.

Even if the Board's new test was not inconsistent with the NLRA, as a statement of agency law, it is impermissibly and unconstitutionally vague. A basic tenet of the law (and due process) is that it must provide regulated entities with the ability to reasonably order their affairs and understand the contours of compliance. This is especially important here where third-party contractor arrangements existed at the time of Taft-Hartley, and there is no indication that Congress intended to restrict their use. As a result, any joint-employer test must give parties a comprehensible statement of its boundaries, so they may lawfully and predictably create the relationships they desire, or restructure them. The new test fails to do so, and instead creates an amorphous, unworkable fog.

Finally, on the facts, Browning-Ferris is not a joint employer under either the Board's prior test or its new one. As to the latter test, even if found consistent with the NLRA, because the Board has departed from its 30-year precedent, it would be inequitable to apply the new standard to Browning-Ferris here.

## STANDING

Browning-Ferris has standing because it was a respondent in the Board proceedings and was aggrieved by the orders under review.

## STANDARD OF REVIEW

NLRB decisions are reviewed under the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706(2). *W&M Props. of Conn., Inc. v. NLRB*, 514 F.3d

1341, 1348 (D.C. Cir. 2008). If the NLRB "fail[s] to apply the proper legal standard," its order thus "will not survive review." *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 446 (D.C. Cir. 2004).

Here, the threshold legal question is whether the Board properly construed the common law in light of Congress' intent that direct and immediate control is necessary to employment relationships recognized under the NLRA. "Deference under the *Chevron* [*Chevron USA Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)] doctrine . . . does not apply" to the Board's analysis of the common law. *Aurora Packing Co. v. NLRB*, 904 F.2d 73, 75-76 (D.C. Cir. 1990). *See also United Ins. Co.*, 390 U.S. at 260; *Lancaster Symphony Orchestra v. NLRB,* 822 F.3d 563, 565-566 (D.C. Cir. 2016); *Int'l Longshoremen's Ass'n v. NLRB*, 56 F.3d 205, 212 n.4 (D.C. Cir. 1995) ("'When Congress indicated that it wanted the judge-made common law of agency to govern the construction of a [statutory provision], it rejected the basis of [*Chevron*'s] presumptions.'") (citation omitted). Thus, this Court reviews whether the Board fashioned the correct common-law standard *de novo.*

In deciding whether the Board's new joint-employer test also is contrary to Congress' intent regarding stable collective bargaining, as well as to other parts of the NLRA dependent upon the definition of an employment relationship, this Court reviews the Board's ruling under the two-step framework provided in *Chevron*,

467 U.S. at 842-843. At step one this Court asks "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If so, "that is the end of the matter[,] for the court . . . must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-843. If the statute is ambiguous, under *Chevron*'s second step this Court asks whether the Board's interpretation is "a permissible construction of the statute" to which it must defer. *Id.* at 843. *See Int'l Alliance of Theatrical & Stage Emps., Local 39 v. NLRB*, 334 F.3d 27, 33-35 (D.C. Cir. 2003).

Even if the Board's adoption of its new test were entitled to some deference, it still would be subject to "arbitrary and capricious" review. Where, as here, the Board seeks to distinguish between conduct resulting in a joint employment relationship and that which does not, it "must do so under a legal theory that permits a [party] reasonably to 'predict' whether a particular practice will be lawful or not. Otherwise, we sanction impermissible 'ad hocery' on the part of the Board which is the core concern underlying the prohibition of arbitrary or capricious agency action." *Pac. Nw. Newspaper Guild, Local 82 v. NLRB*, 877 F.2d 998, 1003 (D.C. Cir. 1989).

Indeed, an administrative standard violates due process requirements if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits [or requires]" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S.

703, 732 (2000). *See also Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972) (requiring avoidance of "resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.").

With respect to the Board's factual determinations, they will not be enforced if not supported by "substantial evidence." Where the record evidence "is in conflict, the substantial evidence test requires the Board to take account of contradictory evidence, and to explain why it rejected evidence that is contrary to its findings." *Carpenters & Millwrights*, *Local Union 2471 v. NLRB*, 481 F.3d 804, 809 (D.C. Cir. 2007) (quotation omitted).

## ARGUMENT

## I. THE NLRB'S NEW JOINT-EMPLOYER TEST FAILS AS A MATTER OF LAW

### A. The Board's Prior Joint-Employer Test

Section 2(2) of the Act states that "[t]he term 'employer' includes any person acting as an agent of an employer, directly or indirectly." 29 U.S.C. § 152(2). The Supreme Court has explained that Congress meant "to incorporate the established meaning of th[at] ter[m]," and "'intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.'" *NLRB v. Town & Country Elec., Inc.,* 516 U.S. 85, 94 (1995) (quoting *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322-323 (1992) *and Cmty. for Creative Non-Violence v. Reid,* 490 U.S. 730, 739-740 (1989)).

Prior to 1984, the Board did not have a consistent and coherent view of the common-law test for joint-employer relationships. In two 1984 cases, *Laerco Transp.*, 269 NLRB 324 (1984) and *TLI, Inc.*, 271 NLRB 798 (1984), *enfd. mem.* 772 F.2d 894 (3d Cir. 1985), the Board clarified its approach by adopting the standard articulated in *NLRB v. Browning-Ferris Industries of Pennsylvania*, 691 F.2d 1117 (3d Cir. 1982). In that case, the Third Circuit held that a joint-employer relationship exists only "where two or more employers exert significant control over the same employees." *Id.* at 1124.

> The basis of the [joint-employer] finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus, the 'joint employer' concept recognizes that the business entities involved are in fact separate but that they <u>share or co-determine those matters governing the essential terms and conditions of employment</u>.

*Id.* at 1123 (emphasis supplied).[5]

As the Board would later explain in *Airborne Express*, 338 NLRB 597, 597 n.1 (2002), under the Third Circuit's test, "[t]he essential element in [the] analysis is whether a putative joint employer's control over employment matters is <u>direct and immediate</u>." (emphasis supplied). Importantly, in *AM Prop. Holding Corp.*,

---

[5]    A putative joint employer is not an alter ego but instead is a separate entity from the direct employer of the employees. *See, e.g., Browning-Ferris*, 691 F.2d at 1122.

17

350 NLRB 998, 1000 (2007), the Board concluded that a contractual provision giving the purchaser of services the right to approve hires by the provider was not, standing alone, sufficient to establish joint employer status. Rather, "[i]n assessing whether a joint employer relationship exists, the Board did not rely merely on the existence of such contractual provisions, but rather looked to the <u>actual practice of the parties</u>." *Id.* (emphasis supplied).[6]

Similarly, in *Laerco* and *TLI*, the Board held that joint-employer status could not be established by evidence that a company contracting for labor services engaged in "limited and routine" supervision of the provider's employees while they were on its premises. The Board recognized that service arrangements necessarily involve a degree of client oversight to ensure the agreed-upon services

---

[6]      Before its clarification of the joint-employer test in *Laerco* and *TLI*, the Board applied a hodgepodge of different analyses, including finding no joint employer relationship despite the presence of "indirect control" factors that the majority now claims justify such a finding. As the dissent noted, "[c]ontrary to the majority, the Board's prior cases did not manifest an intention to apply a broad analytical framework in which indirect control played a determinative role in joint-employer cases. . . . We disagree . . . with the notion that prior to *TLI* and *Laerco* the Board, as a rule, gave much probative weight to evidence of 'indirect control,' or that such evidence, standing alone, was routinely determinative. . . . The majority fails to mention that in many of the cited cases there was evidence that the contractual rights <u>were exercised</u>, and there was other evidence of direct control over employees' work. . . . The interpretive key to different outcomes in this precedent is not due to a markedly different legal test[.]" JA-401 (emphasis in original). *See also Goodyear Tire & Rubber Co.*, 312 NLRB 674, 676 (1993) ("Prior to 1982 when the United States Court of Appeals for the Third Circuit decided [*Browning-Ferris*], the Board's analysis of what constituted a joint employer relationship was somewhat amorphous.").

18

are being delivered, and that the performance does not unduly interfere with other aspects of the client's operations.[7] *Laerco*, 269 NLRB at 326; *TLI*, 271 NLRB at 799. *See also AM Prop. Holding Corp.*, 350 NLRB at 1001.

Accordingly, for the last 30 years, direct and immediate control over key employment terms was required for a joint-employer relationship. By contrast, indirect control alone, an unexercised potential right to control, or the "limited and routine" control inherent in a service arrangement, was insufficient.

### B.     The Board's New Joint-Employer Test

In this case, the Board overruled *TLI*, *Laerco*, *Airborne Express*, and *AM Property,* explicitly rejecting its longstanding requirement that there must be proof of direct and immediate control over key employment terms. JA-384.

The Board purported to ground its new analysis in the Third Circuit's distillation of the common law in *Browning-Ferris*:

> Under this standard, the Board may find that two or more statutory employers are joint employers of the same statutory employees if they 'share or codetermine those matters governing the essential terms and conditions of employment.'

---

[7]     *See also So. Cal. Gas Co*., 302 NLRB 456, 461 (1991) ("An employer receiving contracted labor services will of necessity exercise sufficient control over the operations of the contractor at its facility so that it will be in a position to take action to prevent disruption of its own operations or to see that it is obtaining the services it contracted for. It follows that the existence of such control, is not in and of itself, sufficient justification for finding that the customer-employer is a joint employer of its contractor's employees.").

JA-370 (footnote and citation omitted). It began with the proposition that the Third

Circuit adopted a two-part test:

> In determining whether a putative joint employer meets this standard, the initial inquiry is whether there is a common-law employment relationship with the employees in question. If this common-law employment relationship exists, the inquiry turns to whether the putative joint employer possesses sufficient control over employees' essential terms and conditions of employment to permit meaningful collective bargaining.

*Id.*

The Board then profoundly departed from its longstanding precedent by

expanding the concept of "control" over key employment terms. It concluded that

indirect control or even an unexercised potential right to control are enough to

show a joint-employer relationship:

> [W]e will no longer require that a joint employer not only <u>possess</u> the authority to control employees' terms and conditions of employment, but must also <u>exercise</u> that authority, and do so directly, immediately, and not in a 'limited and routine' manner. . . . The right to control, in the common-law sense, is probative of joint-employer status, as is the actual exercise of control, whether direct or indirect.

*Id.* (emphasis in original).

The Board's new test is inconsistent with the NLRA and Congress'

understandings of the common law in at least four ways:

1.  It removes <u>any</u> requirement that a putative joint employer have direct and immediate control over "essential employment terms and conditions." *See infra* at 22-27.

2.  It makes no allowance for the type of "limited and routine" oversight inherent in a service arrangement. *See infra* at 27-32.

20

3.    It holds that an unexercised potential "right to control" <u>itself</u> may be sufficient to establish joint employer status. *See* JA-393 ("[E]ven a power reserved by contract but never exercised, will be considered and may suffice, <u>standing alone</u>, to find joint-employer status") (emphasis in original). *See infra* at 22-27.

4.    It mischaracterizes the client's economic or other <u>influence</u> upon the <u>provider</u> as <u>control</u> over its <u>employees</u>, and concludes that it too may be sufficient to establish a joint employer relationship. *See infra* at 41-47.

As the dissent stressed, the Board has never adopted such a reading of the common law in the 80 years of the Act. JA-391. The dissent correctly read the NLRA's application of the common law to require the following:

> Our fundamental disagreement with the majority's test is not just that they view indicia of indirect, and even potential, control to be probative of employer status, they hold such indicia can be <u>dispositive</u> without <u>any</u> evidence of direct control. Under the common law, in our view, evidence of indirect control is probative <u>only to the extent that it supplements and reinforces evidence of direct control</u>.

JA-390 (emphasis in original and supplied).

**C.    The Board's New Joint-Employer Test Is Contrary To The Employment Relationships Recognized By Congress In The 1947 Taft-Hartley Amendments To The NLRA**

**1.    *The Board's test is contrary to Congress' intent that direct and immediate control is necessary to an employment relationship under the Act***

The Board's new test fails as a matter of law because it is contrary to Congress' intent in the 1947 Taft-Hartley amendments to the NLRA (Pub. L. 80-101) that <u>direct and immediate control</u> is necessary to an employment — and, therefore, a joint-employer — relationship.

21

Taft-Hartley revised the definition of "employee" in Section 2(3) of the Act, 29 U.S.C. § 152(3), to countermand the Supreme Court's construction of the original NLRA in *NLRB v. Hearst Publications*, 322 U.S. 111 (1944). In *Hearst*, the Court upheld a Board finding that Hearst Publications' newspaper distributors (*i.e.*, "newsboys") were "employees" within the meaning of the Act on the ground that common law principles were not determinative in deciding whether an employment relationship existed:

> To eliminate the causes of labor disputes and industrial strife, Congress thought it necessary to create a balance of forces in certain types of economic relationships. These do not embrace simply employment associations in which controversies could be limited to disputes over proper 'physical conduct in the performance of the service.' . . . Its Reports on the bill disclose clearly the understanding that 'employers and employees not in proximate relationship may be drawn into common controversies by economic forces, and that the very disputes sought to be avoided might involve 'employees (who) are at times brought into an economic relationship with employers who are not their employers.' In this light, the broad language of the Act's definitions, which in terms reject conventional limitations on such conceptions as 'employee,' 'employer,' and 'labor dispute,' leaves no doubt that its applicability is to be determined broadly, in doubtful situations, by underlying economic facts rather than technically and exclusively by previously established legal classifications.

322 U.S. at 128-129 (emphasis supplied).

In response to *Hearst*, Congress revised the Act's "employee" definition specifically to exclude independent contractors. Reviewing Taft-Hartley's legislative history, the Supreme Court later explained that:

[In *Hearst*] the standard was one of economic and policy considerations within the labor field. Congressional reaction to this construction of the Act was adverse and Congress passed an amendment specifically excluding 'any individual having the status of an independent contractor' from the definition of 'employee' contained in s 2(3) of the Act. <u>The obvious purpose of this amendment was to have the Board and the courts apply general agency principles in distinguishing between employees and independent contractors under the Act</u>. . . . <u>Thus there is no doubt that we should apply the common law agency test here in distinguishing an employee from an independent contractor</u>.

*United Ins. Co.*, 390 U.S. at 256 (1968) (emphasis supplied). *See also Boire v. Greyhound Corp.*, 376 U.S. 473, 481 n.10 (1964); *Darden*, 503 U.S. at 324.[8]

As the dissent underscored, the Board's new joint-employer test is invalid because it does not comport with governing common-law agency principles, which evaluate the degree and nature of the control — if any — actually exercised over putative employees. JA-395. The dissent explained:

Without attribution, <u>our colleagues state that the common law considers as potentially dispositive not only direct control, but also indirect control and even 'reserved' control that has never been exercised</u>. They would accordingly jettison the joint-employer test's requirement of evidence that the putative employer's control be 'direct and immediate.' . . . [H]owever, 'control' under the common-law principles <u>requires some direct-and-immediate control</u> even where indirect control factors are deemed probative. <u>The Act, and its incorporation of the common law, does not allow the Board to broaden the standard to include indirect control or an inchoate right to</u>

---

[8]    The Taft-Hartley amendments also modified the definition of "employer" to encompass those persons who are "acting as an <u>agent</u> of an employer," rather than any individual broadly "acting in the <u>interest</u> of any employer," as the statute previously read. 29 U.S.C. § 152(2) (emphasis supplied).

exercise control, standing alone, as a dispositive factor, which the majority does today.

JA-396 (emphasis in original and supplied).

Section 220 of the Restatement (Second) of Agency supports the conclusion that direct and immediate control is required, noting in the comments that the factors listed as evidence of control "are not looking to indirect control." JA-397. Further, under Section 227 (Servant Lent to Another Master), an employee "can become the servant of another only if there are the same elements in his relation to the other as would constitute him a servant of the other were he not the servant of the first." (emphasis supplied). A wholly asymmetric relationship — where one entity exercises direct control over key employment terms and the other has only indirect control or an unexercised potential right to control — is insufficient, standing alone, to create a joint-employer relationship. So too is the exercise of "limited and routine" oversight designed to ensure that a service provider's employee does not interfere with the client's operations.[9]

---

[9]    Section 227's illustrations underscore the point. *See* Illustration 1. ("In the absence of evidence that [the client] is to control the details as to the management of the cab, the driver is [the provider's] servant while driving the cab."); 4. (limited instructions on how to perform work insufficient); 5. (employee remains in supplier's employment unless user "assumes control over the manner" of performing contracted work) (emphasis supplied). Likewise, comment d. (*Where servant obeys temporary employer*) emphasizes the requirement of direct and immediate control, which the Restatement distinguishes from mere requests or guidance: "The fact that he obeys the requests of the temporary employer as to the act does not necessarily cause him to be the servant of such employer. . . . If the

Under the common law, it is direct and immediate control exerted by a putative employer that matters. Critically, that is how Congress understood the common law when it enacted the Taft-Hartley amendments. The accompanying House Committee Report emphasized:

> An 'employee,' according to all standard dictionaries, according to the law as the courts have stated it, and according to the understanding of almost everyone, with the exception of members of the National Labor Relations Board, means someone who works for another for hire . . . . 'Employees' work for wages or salaries <u>under direct supervision</u>. . . . It must be presumed that when Congress passed the Labor Act, it intended words it used [such as 'employee'] to have the meanings that they had when Congress passed the act, not new meanings that, 9 years later, the Labor Board might think up. . . . It is inconceivable that Congress, when it passed the act, authorized the board to give to every word in the act whatever meaning it wished.

H.R. Rep. No. 245, 80th Cong., 1st Sess., 18 (1947) (emphasis supplied).[10] In

*Allied Chemical & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 167 (1971), the Supreme Court relied upon the House

Committee Report as an expression of Congress' intent, which therefore supplants

---

employee does the <u>very act</u> directed by the temporary employer, the latter is responsible for having directed it[.]") (emphasis supplied).

[10]     The need for a sufficient exercise of direct control is further embodied in the "supervisor" definition which Taft-Hartley enacted in Section 2(11) of the NLRA: "any individual having the authority . . . to hire, transfer, [etc.] if in connection with the foregoing <u>the exercise of such authority</u> is not merely routine or clerical in nature, but requires the use of independent judgment." 29 U.S.C. § 152(11) (emphasis supplied).

any attempt to re-interpret the common law to provide a broader definition.[11] *See also Local 777, Democratic Union Org. Comm., Seafarers Int'l Union of N. Am.,* 603 F.2d 862, 903 (D.C. Cir. 1978), *reh'g denied,* 603 F.2d 891 (D.C. Cir. 1979) (same).

Following Taft-Hartley, the Court further confirmed that "under the common law loaned-servant doctrine <u>immediate control and supervision is critical in determining for whom the servants are performing services</u>."[12] *Shenker v. Baltimore & Ohio R. Co.,* 374 U.S. 1, 6 (1963) (applying *Standard Oil Co. v. Anderson,* 212 U.S. 215 (1909) (emphasis supplied)). *See also Kelley v. So. Pac. Co.,* 419 U.S. 318, 329-330 (1974) (cited with approval in *Reid,* 490 U.S. at 739-740 and *Darden,* 503 U.S. at 323).

Because the Board's new test directly contradicts Congress' intent that an employment relationship under the NLRA requires direct and immediate control, it cannot be given effect.

---

[11]     Moreover, Taft-Hartley's understanding of the common law rules out relying upon such analysis in cases that do not arise under the NLRA, as the Board inappropriately did here. JA-385.

[12]     The dissent noted that "[a]s courts undoubtedly realized, anyone contracting for services, master or not, inevitably will exert and/or reserve some measure of indirect control by defining the parameters of the result desired to ensure he or she gets the benefit of his or her bargain." JA-398. *See, e.g., Radio City Music Hall Corp. v. United States,* 135 F.2d 715, 717-718 (2d Cir. 1943) (L. Hand, J.).

## 2. The Board's test is inconsistent with this Court's analysis of who constitutes an "employee" under the Act

The Board's new joint employer test also is inconsistent with this Court's analysis of employment relationships under the NLRA, which has emphasized the importance of direct and immediate control over key employment terms[13]:

For example, in *Aurora Packing Co.*, this Court found that "'the extent of the <u>actual supervision</u> exercised by a putative employer over the 'means and manner' of the workers' performance is <u>the most important element</u> to be considered in determining whether or not one is dealing with independent contractors or employees.'" 904 F.2d at 76 (quoting *Local 777,* 603 F.2d at 873) (emphasis in original and supplied). *See also Lancaster Symphony,* 882 F.3d at 566 (finding "'the extent of control' . . . requires that we examine 'the extent of the actual supervision exercised by a putative employer over the means and manner of the workers' performance.'") (citation omitted); *Lodge 1858, Am. Fed'n of Gov't Emps. v. Webb,* 580 F.2d 496, 504 (D.C. Cir. 1978) (stressing importance of supervision, meaning day-to-day "control of the individual workman's physical conduct") (citing *Kelley*, 419 U.S. at 324 and Section 220(1) of the Restatement (Second) of Agency)).

---

[13]     As the dissent stressed, there is no judicial precedent adverse to the Board's prior joint employer standard nor supportive of the Board's new test. "It is reasonable to assume that if *TLI*, *Laerco*, and progeny departed abruptly from Board precedent without explanation, reviewing courts would by now have had the opportunity to criticize those decisions and would certainly have done so." JA-402.

In *Local 777*, this Court held that "pervasive control" over the manner and means of job performance was necessary for an employer finding. 603 F.2d at 898, 901-904. This Court based its conclusion on its review of Taft-Hartley's legislative history, which provides "clear evidence that Congress did not intend that an unusually expansive meaning should be given to the term 'employee' for the purpose of the Act," and the fact that the "statutory definition that has not been changed in any respect since it was significantly amended in 1947 to correct the construction that was applied in [*Hearst*]." *Id.* at 880, 893.

Having concluded that direct and immediate control over key employment terms is essential to a joint-employer finding, this Court has given a right to control little if any weight when it merely is potential and unexercised. This Court has not held that such an inchoate right itself is sufficient to establish employer status. Nor is the routine and limited oversight which is part of any contractor relationship.

Thus, in *N. Am. Van Lines, Inc. v. NLRB*, 869 F.2d 596, 598 (D.C. Cir. 1989), after reiterating that "the Board exercises power only within the channels intended by Congress," this Court held that the necessary element of direct and immediate control cannot be found based on routine, high-level monitoring of the purported employees' performance:

> [S]ignificant limits . . . exist upon what actions by an employer count
> as control over the means and manner of performance. Most
> important, employer efforts to monitor, evaluate, and improve the
> results or ends of the worker's performance do not make the worker

> an employee. Such global oversight, as opposed to control over the manner and means of performance (and especially the details of that performance), is fully compatible with the relationship between a company and an independent contractor. . . . Indeed, employer efforts to ensure the worker's compliance with government regulations, even when those efforts restrict the manner and means of performance, do not weigh in favor of employee status.

*Id.* at 599. This Court also drew a strong distinction between the putative employer's indirect influence through the economics of the contractor relationship and actual control over the employees that is necessary to create an employment relationship under the NLRA:

> [E]vidence of unequal bargaining power, without more, is not to be taken as evidence of control over the manner and means of the worker's performance. As *Local 777* points out, the court will draw no inference of employment status from 'merely the economic controls which many corporations are able to exercise over independent contractors with whom they contract.'

*Id.* (citations omitted) (emphasis supplied).

*Local 777* makes the same points. There, this Court found unpersuasive the Board's conclusion that the putative employer's "economic controls" rather than "the more usual forms of direct control typical of an employer/employee relationship" was sufficient to create an employment relationship. 603 F.2d at 873 (emphasis supplied).

This Court also held in *Local 777* that routine and limited oversight is not enough to create an employment relationship: "[T]he minor controls, analyzed

above, are simply too insubstantial to justify a conclusion that the lessee cab drivers are 'employees.'" *Id.* at 904.

Importantly, this Court <u>rejected an unexercised potential right to control as even a factor</u>:

> Lease term is short and renewable at the Company's discretion. . . . At most, it could furnish an opportunity for the Companies to exercise some indirect control, but since there is no evidence that the Companies use the threat of nonrenewal to exercise pervasive control over the manner and means in which drivers conduct their business, the provision in the lease does not furnish any support for the conclusion that the drivers are employees. . . . Lease terms unilaterally set by the Companies. This is evidence of bargaining power, but the Board does not explain how the terms of the lease, which are uniform, have in any way been used to control the drivers in the manner and means that they operate their cabs under the lease. Nothing in the record indicates that this power has been so used.

*Id. at* 899.

In *FedEx Home Delivery v. NLRB*, 563 F.3d 492 (D.C. Cir. 2009), this Court once again concluded that routine and limited oversight does not create employer status. It explained that "constraints imposed by customer demands and government regulations do not determine the employment relationship. '[W]here a company's control over an aspect of the workers' performance is motivated by a concern for customer service, that control does not suggest an employment relationship.' Employer efforts to monitor, evaluate, and improve the results of

30

ends of the worker's performance do not make the worker an employee.'" *Id.* at 501 (citations omitted).[14]

****

Although all of these cases involved consideration of whether individuals were employees or independent contractors, the joint employer analysis is essentially the same because it too depends upon the meaning of the words "employer" and "employee" as used in the NLRA, and Congress' intent regarding what the Act would recognize as employment relationships.

Moreover, this Court recognizes that a putative employer must have "pervasive" control over critical employment terms and actual job performance. Routine and limited client demands, general oversight, monitoring, and maintenance of standards is inherent in a service arrangement and immaterial. Finally, this Court is careful to distinguish a client's economic or contractual influence over the service provider with immediate control over the provider's employees, or the ability to displace the provider and directly exercise such control. The Board's new joint-employer test conflicts with this Court's common law understandings and is not entitled to enforcement.

---

[14] *FedEx*'s assessment of entrepreneurial considerations is not relevant to joint employer analysis with its focus on borrowed-servant agency factors. Neither the Board majority nor the dissent suggests that they are. It is undisputed that the persons in the petitioned-for bargaining unit are employees, not independent contractors. The issue is whether they are Leadpoint's (*i.e.*, the entrepreneur's) employees, not Browning-Ferris'.

31

### 3.     *The Board's reliance upon the Third Circuit's Browning-Ferris approach is misplaced*

The Board purported to be "reaffirm[ing] the standard" and "return[ing] to the traditional [joint employer] test" articulated by the Third Circuit in *Browning-Ferris.* JA-371, 383. But that decision supports the Board's prior test — not the Board's new test. The Third Circuit did not hold that indirect control or an unexercised potential right to control is <u>sufficient</u> to establish a joint employer relationship without "significant" evidence of <u>active</u> "shar[ing]" or "co-determin[ing]" of direct control over key terms.

Indeed, it says the opposite, concluding that a joint-employer relationship exists only "where two or more employers <u>exert</u> significant control over the same employees." 691 F.2d at 1123 (emphasis supplied). The Third Circuit's "capsul[ing]" of the evidence bears out this requirement: Browning-Ferris' [*i.e.*, "BFI" as referenced in the Third Circuit opinion] supervisor "acted" as "'boss'" regarding the employees' functions; BFI "established" driver work hours; "determine[d]" shift times; "provided" the same uniforms; "determined" compensation; "shared . . . day-to-day" supervision; "directed" the drivers "as if they were their own employees;" actively used its own forms for driver recordkeeping purposes; "shared . . . the power" to approve drivers [which BFI actually exercised] and "devised the rules" under which the drivers were to operate. 691 F.2d at 1124-1125.

32

Far from bearing the weight the majority would ascribe to it, the Third Circuit's test demonstrates that joint-employer status requires <u>actual day-to-day</u> "shar[ing]" or "codetermin[ing]," *i.e.*, exertion, of control over key employment terms to occur.

### 4. *The Board's test is contrary to the treatment of employment relationships in Taft-Hartley's secondary boycott provisions*

The Board's new joint-employer test also is invalid because it fails to comport with all of the Act's designs. In particular, the virtually boundless scope of the Board's new joint-employer test would wreak havoc with the NLRA's secondary boycott provisions in Section 8(b)(4)(ii)(B) [29 U.S.C. § 158(b)(4)(ii)(B)]. These provisions prohibit strikes, picketing or coercive pressure against a non-employer. If the Board's new joint-employer rule were allowed to stand, it would substantially broaden the businesses that now may be subject to such actions as primary employers. And, as the dissent pointed out, it would do so "in a manner Congress did not intend. The targeted joint employer may not have direct control or even any control over the particular terms or conditions of employment that are the genesis of the labor dispute." JA-415.

There is no way around this problem. Because Congress enacted a single, unitary "employer" definition for the NLRA, the same definition must apply throughout the Act. *See, e.g., FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-133 (2000) ("It is a fundamental canon of statutory construction that

the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme.") (citations and internal quotations omitted). But the Board's new joint-employer rule is directly contrary to the way the courts have construed the terms "employer" in secondary boycott cases.

In *AFTRA, Washington-Baltimore Local v. NLRB*, 462 F.2d 887 (D.C. Cir. 1972), this Court considered whether a separate, unincorporated division of the Hearst Corporation was "in fact an autonomous and unoffending employer" in relation to another division for Section 8(b)(4) [29 U.S.C. § 158(b)(4)] purposes. *Id.* at 890. After reviewing control elements similar to those the Board focused on here, this Court concluded that "[a]s the Board correctly held, however, the test is not whether an unexercised power to control exists. 'There must be in addition such actual or active common control, as distinguished from merely a potential [to control], as to denote an appreciable integration of operations and management policies.'" *Id.* at 892 (citations omitted).

The Board cannot have a joint employer test which is premised upon a looser control formula than that underlying Section 8(b)(4)'s understanding of "an autonomous and unoffending" employer. Section 8(b)(4) also was enacted by Taft-Hartley (and enhanced by 1959's Landrum-Griffin amendments, Pub. L. 86-257),

and its very purpose was to narrow those enterprises that would be found to possess the same primary employer status.

Similarly, in *NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 689-690 (1951), the Supreme Court recognized — contrary to the Board's test here — that "limited and routine"-type oversight emblematic of a contractor arrangement does not create a joint-employer relationship and thereby remove Section 8(b)(4)'s protections:

> [T]he fact that the contractor and subcontractor were engaged on the same construction project, <u>and that the contractor had some supervision over the subcontractor's work, did not eliminate the status of each as an independent contractor or make the employees of one the employees of the other. The business relationship between independent contractors is too well established in the law to be overridden without clear language doing so.</u>

(emphasis supplied). For the Board to "overrid[e]" the "well established" boundaries between businesses contracting over services "without clear language" in the NLRA is patently contrary to the statutory scheme.

The danger in the Board's new rule is compounded by the fact that, as the dissent underscored, it would apply in a myriad of situations: "The number of contractual relationships now potentially encompassed within the majority's new standard," subject to the panoply of bargaining obligations, unfair labor practice scrutiny, and loss of secondary boycott protection, "appears to be virtually unlimited." *e.g.* franchisors, corporate parents/subsidiaries, purchasers of services,

insurance companies and banks mandating employment-related compliance, and others who negotiate performance, quality or product requirements. JA-405.

The Board's claim that it was not addressing this range of relationships, JA-388 n.120, not only is hollow, it is contrary to the common law and the Act. The Board announced a "restated joint-employer standard." JA-370. There is nothing in the Third Circuit's *Browning-Ferris* decision nor the common law that would permit the Board to apply a different joint-employer test depending upon the category of business relationship involved. Nor does the definition of "employer" in Section 2(2) of the NLRA distinguish among such relationships. There may be different factual scenarios, but the salient factors remain the same.

Likewise, as the dissent observed, the Board's assertion that its new test "does not modify any other legal doctrine or change the way that the Board's joint-employer doctrine interacts with other rules or restrictions under the Act[,]" JA-388 n.120, "cannot possibly be valid, because applying different tests in other circumstances would mark an unprecedented and unwarranted break from the unitary joint-employer test under our Act[.]" JA-405. Because Section 2(2) contains a single, unitary definition of "employer" applicable to the entire NLRA, the majority's mere declaration is entirely empty.

**D.    The Board's New Joint-Employer Test Relies Upon An Assessment Of "Economic Realities" Which Congress Prohibited In Enacting The Taft-Hartley Amendments**

The Board recognized that to be enforceable, its new joint employer test must embody the common law understanding of Congress, and not *Hearst* "economic realities" considerations. As a result, it took pains to claim that it was applying only such common law principles. JA-385. Its new test, however, is inextricably intertwined with an "economic realities" analysis in three fatal ways.

**1.    *The Board's revisionist project is driven by impermissible economic considerations***

The Board candidly avowed that its purpose was to respond to what it saw "as the Board's joint-employment jurisprudence increasingly out of step with changing economic circumstances, particularly the recent dramatic growth in contingent employment relationships." JA-369. It found that "[t]his development <u>is reason enough</u> to revisit the Board's current joint-employer standard." JA-379 (emphasis supplied). Moreover, the Board acknowledged that it was assessing what the common law allegedly "permit[s]" through the lens of the situations where — in its view — "meaningful collective bargaining is, in fact, possible." JA-381 (footnote omitted).

The Board's approach is flawed because unlike other areas where it was granted the ability to "'apply[]the general provisions of the Act to the complexities of industrial life[,]'" JA-379, here Congress spoke to the NLRA's limits and

prohibited the Board from applying an "economic realities" or "statutory purpose" rationale in defining who is an "employee" under the Act.[15] JA-396. The Taft-Hartley House Committee Report, which the Supreme Court found to embody Congress' intent, was clear that "when Congress passed the Labor Act, it intended words it used [such as 'employee'] to have the meanings that they had when Congress passed the act, not new meanings that . . . the Labor Board might think up. . . . It is inconceivable that Congress . . . authorized the Board to give to every word in the act whatever meaning it wished." H.R. Rep. No. 245, 80th Cong., 1st Sess., 26 (1947) (emphasis supplied).

Accordingly, Congress anchored employment relationships in its common-law understanding at the time of Taft-Hartley. It insisted on a laser focus in this regard. *See Local 777*, 603 F.2d at 907 (observing that the "vice" of *Hearst* "rejected by Congress" was that "[i]nstead of first determining that the workers in question were within the 'legal classification' of employees as that word is normally understood . . . [the Board and *Hearst* Court] began by inquiring whether

---

[15]     In this vein, Taft-Hartley specifically prohibited the Board from employing any individuals to conduct economic analysis. *See* 29 U.S.C. § 154(a). The Board's reliance upon market forces as motivating a change in the ambit of cognizable employment relationships is a serious statutory error. *See also H. K. Porter Co. v. NLRB*, 397 U.S. 99, 107-108 (1970) ("It is implicit in the entire structure of the Act that the Board acts to oversee and referee the process of collective bargaining, leaving the results of the contest to the bargaining strengths of the parties."); *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 316 (1965) (holding Board not vested with "general authority to define national labor policy by balancing the competing interests of labor and management.").

38

'economic forces'" required extension of the Act's protections). Congress' overarching understanding of the common law was that an employment relationship recognized by the NLRA requires "direct supervision," *i.e.*, direct and immediate control.

In contrast, the dissent stressed that "[t]he majority's explication of its new joint-employer test erases any doubt that the test is the analytical stepchild of *Hearst*, rather than being founded in common law." JA-399. Admittedly driven by its reading of economic dynamics, the Board turned on its head Congress' particular common law vision. Not only does the new test remove the necessity of finding direct and immediate control, it elevates indirect control and even an unexercised potential right to control — the latter reflecting <u>neither direct control</u> nor any <u>actual supervision</u> — to dispositive factors. Moreover, in doing so, the Board dramatically narrowed the range of viable contractor arrangements in a manner that surely would have been a surprise to the Taft-Hartley Congress.

As the dissent emphasized, "nothing in the Act authorizes the Board to impose requirements on companies regarding how they must arrange or rearrange themselves." JA-411. This tenet is reflected in Section 1, 29 U.S.C. § 151, where it is presumed that employers "possess full freedom of association [and] actual liberty of contract," and "are organized in the corporate or other form of ownership

association[.]"[16] Hence, the NLRA is not intended to eliminate, modify, or constrain any of the third-party arrangements available to businesses at common law when Taft-Hartley was enacted.

There is no dispute that "[m]any forms of subcontracting, outsourcing, and temporary or contingent employment date back to long before the 1935 passage of the [Wagner] Act." JA-390. By revising the NLRA to overcome *Hearst*, Congress vindicated the use of contractor and other service arrangements and plainly did not empower the Board to eviscerate them.

Congress has underscored that economic circumstances do not furnish a permissible basis for the Board to alter the NLRA's foundational definitions. By adopting a position on putative "control" far beyond the Taft-Hartley Congress' intent, the Board contravened the Act. "This type of change is clearly within the province of Congress, not the Board." *Id. See also Local 777*, 603 F.2d at 871 n.22 ("The Board can change its mind but it cannot change the statute."); *Brown & Williamson,* 529 U.S. at 133 (reviewing court "must be guided to a degree by

---

[16]     *See also Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 40 (1987) (permitting successor not to assume predecessor's labor contract, but to establish new initial employment terms "careful[ly] safeguards the rightful prerogative of owners independently to rearrange their businesses") (internal quotations omitted).

common sense as to the manner in which Congress is likely to delegate a policy decision" of economic importance to administrative agency).[17]

### 2. *The Board's rendering of its new test involves a prohibited reliance upon "economic realities"*

Through its modification of the NLRA in response to *Hearst*, Congress intended that the Act's coverage be <u>substantively narrower</u> than the Board and Supreme Court had conceived of it. Taft-Hartley thus performs a limiting function regarding the reach of the Act's requirements. Congress meant its existential expression of what employment relationships under the Act necessitate ("direct supervision," *i.e.*, direct and immediate control) to contrast with "economic realities" inconsistent with its governing formulation.

The Board's new joint employer test is contrary to Congress' intent because it embodies both factual and policy considerations upon which *Hearst* relied and which Congress rejected. In doing so, it lies outside the ambit of what Congress considered a permissible common law application. Moreover, it confuses a client's economic influence upon a service provider with actual control over the provider's employees. And it obscures that distinction by positing "layers" of control unrecognized by the Act.

---

[17]     In Taft-Hartley itself, Congress established a "Joint Committee to Study and Report on Basic Problems Affecting Friendly Labor Relations and Productivity," which examined stakeholder concerns and reported back to Congress with policy recommendations. 29 U.S.C. §§ 191-197.

(a)       *Factual indicia* In *Hearst*, the Court distilled the Board's factual findings supporting employment status as follows:

> [T]he designated newsboys work continuously and regularly, rely upon their earnings for the support of themselves and their families, and have their total wages influenced in large measure by the publishers who dictate their buying and selling prices, fix their markets, and control their supply of papers. Their hours of work and their efforts on the job are supervised and to some extent prescribed by the publishers or their agents. Much of their sales equipment and advertising materials is furnished by the publishers with the intention that it be used for the publisher's benefit.

322 U.S. at 131. *See also id.* at 117-119 ("In addition to effectively fixing the compensation, respondents in a variety of ways prescribe, if not the minutiae of daily activities, at least the broad terms and conditions of work. . . . Sanctions, varying in severity from reprimand to dismissal, are visited on the tardy and the delinquent.")

Thus, in overcoming *Hearst*, Congress <u>rejected</u> the notion that <u>substantial influence</u> upon (but not actual dictation of) compensation, and control over "broad terms and conditions of work" (but not "the minutiae of daily activities"), were viewed as highly probative "economic facts" in establishing an employment relationship.

The Board here misconstrued similar considerations as evidencing control, rather than "economic facts" (commonly referred to as "economic realities"):

> <u>Where the user firm owns and controls the premises, dictates the essential nature of the job, and imposes the broad, operational</u>

> contours of the work, and the supplier firm, pursuant to the user's
> guidance, makes specific personnel decisions and administers job
> performance on a day-to-day basis, employees' working conditions
> are a byproduct of two layers of control.

JA-382 (emphasis supplied). This is an incurable flaw in the Board's new test.

Even the *Hearst* Court recognized that the essence of "control" as understood

contemporaneously was "physical conduct in the performance of the service," *i.e.*,

direct and immediate control. *See* 322 U.S. at 128 n.27 (emphasizing such control is

the "traditional test of the 'employee relationship' at common law."). It was

because the Court did not find control of this sort on the facts that it resorted to the

economic analysis which the Taft-Hartley Congress later disavowed. Congress,

through legislation, retorted that such control forms the core of employment for

purposes of the common law and therefore for the Act as well. [18]

In contrast, the Board's conception of a client's purported "control" over a

service provider's employees is, at most, the establishment of agreed-upon ends

and "limited and routine" oversight over the provider in carrying out those ends.

This Court's decisions, *supra* at 27-32, surely contemplate that a customer for

services <u>can</u> "dictate[] the essential nature of the job, and impose[] the broad,

operational contours of the work" without creating an employment relationship. A

---

[18]    Unlike *Hearst* where the issue was whether collective bargaining was
appropriate at all, in a putative joint employer situation, there already <u>is</u> an
employer who indisputably would be capable of carrying out all statutory
obligations.

43

client need not engage in pantomime; expressing those ends is at the very essence of contractor relationships. Any other result would inappropriately eliminate third-party arrangements which plainly existed at the time of Taft-Hartley.

Similarly, the Board's notion of "layers" of such "control" is fundamentally inconsistent with Congress' focus on "direct supervision." A "layer" of "guidance" of a service provider is not actual <u>control</u> over the provider's <u>employees</u>.[19] Nor is the client's economic or other influence at the provider "layer." For purposes of the NLRA, they are forbidden "economic realities."

In any system of open competition — which the NLRA presumes — there always will be market forces, pricing limitations, and customer criteria. *See, e.g., Hychem Constructors, Inc.*, 169 NLRB 274, 276 n.4 (1968) ("While a determination by the client to continue the business arrangement, because the price is favorable to him, might remotely benefit the supplier's work force, the exercise of this right by the client would not establish an employment relationship between the client and the supplier's employees."). As the Board acknowledged, it is the service provider — an independent business — which decides in its discretion whether and how to undertake specific actions on a day-to-day basis. JA-382. The

---

[19]     A common example of the difference is cost-plus service arrangements. The Board conceded that such an arrangement "on its own, is not necessarily sufficient to create a joint-employer relationship." JA-387. This concession does not go far enough. Cost-plus pricing may influence employee compensation at some level, but it does not reflect <u>control</u>. *See Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 206-207 (1964).

provider's ultimate decisionmaking authority defeats any claim that the client controls the provider's employees.

The Board also missed the mark in asserting that sufficient control may be based upon the fact that per contract "the user can still compel the <u>supplier</u> to conform to its expectations" and "[i]f the <u>supplier</u> does not exercise its discretion in conformance with the user's requirements, the user may at any time exercise its contractual right and intervene[.]" JA-381-382 (emphasis supplied). Any contracting party has expectations — the client presumably is entitled to performance less random than a game of darts. Standard protections against an incompetent provider — never exercised nor given meaning — are far afield from "direct supervision" of the provider's employees.

(b)    *Policy Hearst*'s interpretation of the NLRA is significant, because Congress disavowed its premises through Taft-Hartley:

> Congress, on the one hand, was not thinking solely of the immediate technical relation of employer and employee. It had in mind at least some other persons than those standing in the <u>proximate legal relation</u> of employee to the particular employer involved in the labor dispute. . . . Congress had in mind a wider field than the <u>narrow technical legal relation of 'master and servant,'</u> as the common law had worked this out in all its variations[.] . . . Congress thought it necessary to create a balance of forces in certain types of economic relationships. <u>These do not embrace simply employment associations in which controversies could be limited to disputes over proper 'physical conduct in the performance of the service.'</u> . . . <u>Myriad forms of service relationship, with infinite and subtle variations in the terms of employment, blanket the nation's economy.</u> . . . <u>Unless the common-law tests are to be imported and made exclusively con-</u>

45

> trolling, without regard to the statute's purposes, it cannot be irrelevant that the particular workers in these cases are subject, as a matter of economic fact, to the evils the statute was designed to eradicate and that the remedies it affords are appropriate for preventing them or curing their harmful effects in the special situation.

322 U.S. 124-127 (footnotes omitted) (emphasis supplied). The Taft-Hartley Congress did, however, adjust the "statute's purpose" by making the "common-law tests . . . exclusively controlling." It collapsed supposed "layers" of control. It underscored that only "proximate legal relations," "narrow technical legal relations of 'master and servant,'" and "employment associations . . . limited to" such relations matter. Taft-Hartley's reaction to *Hearst* confirms what the Supreme Court, and now the Board here, would deny on "economic realities" grounds: the *sine qua non* of an NLRA employment relationship made authoritative by Congress is control over "physical conduct in the performance of the service," *i.e.*, direct and immediate control.

The facts and policy of *Hearst* teach what Congress decidedly did not consider to constitute an employment relationship under the NLRA. If anything, Browning-Ferris' interaction with Leadpoint's employees is a good deal more attenuated than Hearst Publications' with its newspaper distributors. Leadpoint is an independent service provider. It manages its employees to deliver contracted services within an entrepreneurial framework. Fundamentally, Leadpoint — not Browning-Ferris — has the "proximate relationship" with its own employees

46

which the *Hearst* Court disregarded, and Congress then reiterated as critical to an employment relationship recognized by the Act.

### E.     The Board's New Joint-Employer Test Fails To Promote Stable Collective Bargaining Relationships As Required By The Act

The Board's test also is invalid because it fails to satisfy one of the Act's most basic tenets: the promotion of stable collective bargaining relationships. The dissent correctly asserted that "[t]he new test will cause grave instability in bargaining relationships, contrary to one of the Board's primary responsibilities under the Act." JA-405.

The Supreme Court underscored that the Act aims "to achiev[e] industrial peace by promoting stable collective-bargaining relationships." *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 790 (1996) (internal citation omitted). "To achieve stability of labor relations was the primary objective of Congress in enacting the National Labor Relations Act." *Colgate-Palmolive-Peet Co. v. NLRB*, 338 U.S. 355, 362-363 (1949). *See also Allied Chem. & Alkali Workers, Local Union No. 1*, 404 U.S. at 186-187 (finding an "important theme" of Taft-Hartley "was to stabilize collective-bargaining agreements.").

As the dissent urged, if that statutory purpose is to have any meaning, the Act must provide a predictable manner of correctly identifying who is an "employer." JA-390-391. *Cf. Boise Cascade Corp. v. NLRB*, 860 F.2d 471, 475 (D.C. Cir. 1988) ("[T]he existence of a defined unit is a prerequisite to bargaining

47

over terms and conditions of employment, for parties cannot bargain unless they know which employees a union represents.") (citation omitted). Congress' focus on "direct supervision" serves that goal by establishing an understandable line between entities who deliberately and actively inject themselves into an employment relationship and those who do not.

The dissent described at length the practical consequences of the Board's test, and the lattice of potential joint-employer relationships created thereby.[20] Among the fundamental bargaining instabilities the new test raises but does not resolve are: how to define the appropriate bargaining unit(s); what "employer" participates in Board election proceedings; who does the bargaining; what happens if there are bargaining disagreements between/among the joint employers; how is one employer's confidential information is to be treated vis-a-vis the other employer(s); the number of labor contracts; what contract duration(s); whether the labor contract(s) would govern the service contracts; what would happen when the service provider obtained new clients (who themselves might have union

---

[20]     The dissent noted that its scenario "is obviously simplistic because it related only to <u>one</u> service company, which has only <u>three</u> clients — and in the real world, by comparison, (i) many businesses, large and small, rely on services provided by large numbers of separate vendors, and (ii) many service companies have dozens or hundreds of separate clients. . . . The only thing that is clear at present is that the new standard does not promote collective-bargaining relationships. There is no way that it could, and simple mathematics shows us why." JA-409 (emphasis in original).

obligations); potential Board jurisdiction over some but not all of the contracting entities; multi-location work assignments among unionized and non-union clients; and responsibility for benefit fund contributions and liabilities. JA-406-411.

The test further undermines bargaining stability by producing effects such as:

> how exactly are joint user and supplier employers to divvy up the bargaining responsibilities for a single term of employment that they will be deemed under the new standard to codetermine, one by direct control and the other by indirect control? How does one know who has authority at all over a term and condition of employment, under the majority's vague formulation? What if two putative employer entities get into a dispute over whether one has authority over a certain term or condition of employment? What if the putative employers are competitors?

JA-410. These are meaningful considerations for Browning-Ferris. It is subject to a plenary, unlimited order to bargain which does not even purport to address these issues nor delineate its bargaining obligations in relation to Leadpoint's. JA-424-425. Not only are parties left in the dark about the "who" of bargaining, if they are found to have a duty to bargain, from the beginning they know nothing definitive or especially useful about the "what" or "when."[21]

As the dissent explained, the Board's holding that a joint employer is required to bargain only as to such terms and conditions which it has the authority

---

[21]     As the dissent observed, this puts a putative joint employer in legal peril right out of the box — if it does not bargain when it should have, it violates Section 8(a)(5) [29 U.S.C. § 158(a)(5)] of the Act. If it bargains when it should not have, it contravenes Section 8(a)(2) [29 U.S.C. § 158(a)(2)]. JA-410-411.

to control makes matters worse. It destabilizes the internal dynamics of the negotiations themselves. Bargaining issues typically do not exist discretely in a severable vacuum, but are dependent upon the resolution of a web of connected considerations. For this reason, the Board and courts routinely find that issue-by-issue, fragmented bargaining is contrary to the fundamental purposes of the Act. JA-410.

Indeed, under the NLRA such a balkanized approach to bargaining is not even possible. As noted *supra* at 33-36, the single Section 2(2) "employer" definition is unitary throughout the entire Act. Section 8(d) [29 U.S.C. § 158(d)] defines collective bargaining as applying to "wages, hours, and other terms and conditions of employment," without any indication that an entity found incapable of bargaining over <u>all</u> of these issues must negotiate over some of them. *Cf. NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 349 (1958) (finding "the obligation" and "the duty" to bargain "is limited to those subjects, and, <u>within that area</u>, neither party is legally obligated to yield.") (emphasis supplied).

Even if some allocation of bargaining responsibilities between joint employers could be undertaken, at a minimum, a putative employer at least must have the requisite control over the core subjects expressly identified by Section 8(d): "wages [and] hours[.]" As bargaining is understood by the Act, a party must

be capable of negotiating as to those subjects "and" other terms and conditions — not "or."

Further, if a client has joint-employer status — which it now may attain through a lone strand of indirect control or an unexercised potential right to control, — it will have to engage in an indeterminate bargaining process <u>over its very decision</u> to end the entire contractor arrangement. *See, e.g., W.W. Grainger, Inc.*, 286 NLRB 94, 94 (1987) *enf. den.*, 860 F.2d 244 (7th Cir. 1988) (holding user employer required to bargain over decision to cancel employee leasing agreement). It will have to do so no matter how small or unsophisticated it may be in labor matters, or whether the decision has anything to do with the employees in question.

Similarly, if a service provider and client want to change <u>any aspect</u> of their arrangement "affecting" employment terms, or to reallocate their bargaining responsibilities, one or both of them <u>first</u> will have to undertake the complex and uncertain process of negotiating with the union over their plans. It is not difficult to imagine the untenable impact this would have on fluid service arrangements. From a bargaining stability perspective, the provider and client will have no idea whether their change in "control" — even after labor negotiations — is sufficient to legally

restructure their respective bargaining obligations. The shadow of open-ended Board litigation will be ever present.[22]

The client also will be under a formless cloud of potential Board scrutiny under Section 8(a)(3) [29 U.S.C. § 158(a)(3)] regarding whether union animus is a factor motivating its exit, any of its desired modifications of the employment relationship, or any actions regarding the employees. Joint-employer status makes all the difference, because the Act does not otherwise encompass a customer's decision to cease doing business with its contractor, or to change its terms. *See, e.g., Computer Assocs. Int'l, Inc.*, 324 NLRB 285, 286 (1997) ("[F]inding a violation . . . on the basis of an employer's decision to substitute one independent contractor for another because of the union or nonunion status of the latter's employees is inconsistent with both the language of Section 8(a)(3) . . . and with legislative policies underlying Section 8(b) of the Act aimed at protecting the autonomy of employers in their selection of independent contractors with whom to do business."); *Plumbers Local 447 (Malbaff Landscape Constr.)*, 172 NLRB 128, 129 (1968) (same).

---

[22]     Indeed, nowhere does the majority state whether it is even possible for joint employers to reallocate their bargaining obligations through negotiations with the union, *i.e.*, through a lawful bargaining impasse if the union does not agree. *See Wooster Div. of Borg-Warner, supra; Antelope Valley Press*, 311 NLRB 459, 460 (1993).

The dissent showed that the new test "will produce bargaining relationships and problems unlike any that have existed in the Board's 80-year history, which clearly were never contemplated or intended by Congress." JA-406. The Board's blithe answer is that these are "challenges" which Browning-Ferris and future parties will heroically "navigate." JA-388. That, in the fullness of time, the answers will be provided. In the meantime: opacity, jeopardy, and litigation.

The inadequacy of such a response is evident. These are not minor details on the periphery that can just be "figured out" over time. Where the Board's actions demonstrably will increase bargaining instability, they are irreconcilable with the Act and beyond the Board's purview. If the Board's new test otherwise were consistent with Taft-Hartley in its treatment of the common law — which it is not — it is too destructive of any concept of stable bargaining to be a permissible construction of the NLRA.

## II.    THE NLRB'S NEW JOINT EMPLOYER TEST IS ARBITRARY AND CAPRICIOUS

Even if the Board's interpretation of employment relationships under the NLRA were not wrong as a matter of law, its new joint employer test still would be arbitrary and capricious because it is so vague and unworkable that it deprives employers of their right to due process.

As the dissent accurately observed, there is no limiting principle in the Board's open-ended, multifactor standard. "It is an analytical grab bag from which

any scrap of evidence regarding indirect control or incidental collaboration as to any aspect of work may suffice to prove that multiple entities [are joint employers]. . . . [It] is impermissibly vague and overbroad and . . . fatally ambiguous, providing no guidance as to when and how parties may contract for the performance of work without being viewed as joint employers." JA-403.

A basic tenet of the law (and due process) is that it must provide regulated entities with the ability to reasonably order their affairs and to understand the contours of compliance. *Supra* at 16. This is especially important here where third-party contractor arrangements existed at the time of Taft-Hartley, and there is no indication that Congress intended to restrict their use. *Supra* at 39-40. As a result, any joint employer test must give parties a comprehensible statement of its boundaries, so they may lawfully and predictably create the relationships they desire, or restructure them.

Among the new test's many serious shortcomings:

* It does not adequately distinguish between and identify indicia of "control" (which may lead to employment status) and mere influence or oversight (which do not). This especially is the case as to indirect control or an unexercised potential right to control.

* It does not clearly identify the quantum of "control" over "essential terms and conditions of employment" necessary to trigger joint employer status. "[T]he majority fails to provide any guidance as to what control, under what circumstances, would be insufficient to establish joint-employer status. . . . The majority repeatedly states that almost every aspect of a business relationship may be <u>probative</u>, but it

54

provides no significant guidance as to what may or should be <u>determinative</u>." JA-394 (emphasis in original).

\*      It does not require the Board to identify at the outset those specific terms over which the joint employer has a bargaining obligation. (As noted, *supra* at 49, there is nothing in Browning-Ferris' bargaining order that delineates its responsibilities with particularity).

\*      It does not establish and describe a clear, timely and workable mechanism for joint employers to reorganize their relationship to reallocate bargaining responsibilities, and for the client to potentially exit joint employer status altogether.

In contrast, the prior test's focus on direct and immediate control of key employment terms established "a discernible and rational line between what does and does not constitute a joint-employer relationship under the Act." JA-403.

The result of the new test's deficiencies is the danger of "ad hocery" and "agency whim" of which this Court has cautioned. *See Pac. Nw. Newspaper Guild, Local 82*, 877 F.2d at 1003. Such a regime is unacceptable under the Act. Employers must have the ability to "reach decisions without fear of later evaluations labelling . . . conduct an unfair labor practice," while a union likewise must be able to ascertain "the limits of its prerogatives, whether and when it can use its economic powers . . . or whether in doing so would trigger sanctions from the Board." *First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 678-679, 684-686 (1981).

55

## III.  BROWNING-FERRIS IS NOT A JOINT EMPLOYER UNDER EITHER THE LONGSTANDING TEST THE NLRB ABANDONED IN THIS CASE OR ITS NEW TEST

Browning-Ferris is not a joint employer under the Board's prior test. As the Regional Director correctly determined, it does not have direct and immediate control over Leadpoint's employees' key employment terms. *Supra* at 8-9. Browning-Ferris' interactions with those employees is, at most, the kind of "limited and routine" oversight over a service arrangement that does not create an employment relationship.

Indeed, a comparison between the salient facts here and those in the lead Board decisions — *TLI* and *Laerco* — shows that Browning-Ferris has even less involvement with Leadpoint's employees than the clients in those cases where the Board found no joint employer status. *See TLI,* 271 NLRB at 798-799; *Laerco*, 269 NLRB at 324-325.

The Board's joint-employer determination as to Browning-Ferris here is premised upon findings which this Court has rejected as "control" factors, such as the cost-plus nature of the contract and Browning-Ferris' purported indirect control over Leadpoint's employees. JA-387-389. *See, e.g., Int'l Chem. Workers Union Local 483 v. NLRB*, 561 F.2d 253, 256-257 (D.C. Cir. 1977) (holding purchaser's ability to terminate its service contract is not probative without "showing" that it "misused [this right] to acquire greater control than was explicitly given by the

56

contract[,]" and cost-plus component of arrangement "merely insured that [the user] obtain a satisfactory work product at cost and protected it against unnecessary charges being incurred," which is different from exercising "the type of control which would establish a joint employer relationship.").

Likewise, this Court has held that a client's attempt to ensure compliance with applicable laws and safety standards — which the Board found to support its joint employer holding here, JA-375, 388 — is an inappropriate factor to consider. *North American Van Lines*, 869 F.2d at 599 ("[E]mployer efforts to ensure the worker's compliance with government regulations . . . do not weigh in favor of employee status.").

Beyond those deficiencies, the Board's factual analysis as a whole — including its conclusory rejection of the Regional Director's findings, *e.g.*, JA-374 n.17 — fails to comport with the APA's and this Court's requirement that an agency's determination be based upon substantial evidence and reasoned decisionmaking. *Supra* at 16.

## IV.  EVEN IF THE BOARD'S NEW JOINT-EMPLOYER TEST IS CONSISTENT WITH THE NLRA, IT IS INEQUITABLE TO APPLY ITS REVERSAL OF 30 YEARS OF PRECEDENT TO BROWNING-FERRIS

Finally, even if the Board's new joint-employer test is valid, because it is grounded in a reversal of decades-old precedent, it would be inequitable to apply the standard to Browning-Ferris. Retroactive application of a new test is

57

inappropriate in order to protect settled expectations. *Epilepsy Found. of Ne. Ohio v. NLRB*, 268 F.3d 1095, 1097 (D.C. Cir. 2001).

## CONCLUSION

For the foregoing reasons, Browning-Ferris' petition for review should be granted; the Board's application for enforcement should be denied; and the Board's orders should be vacated.

Respectfully submitted,

/s Stuart Newman
STUART NEWMAN
JOSHUA L. DITELBERG
ALEX MEIER
BRYAN BIENIAS
KAITLYN F. WHITESIDE
SEYFARTH SHAW LLP
 *1075 Peachtree Street, NE*
 *Suite 2500*
 *Atlanta, GA 30309-3962*
 *(404) 885-1500*

MICHELE L. ODORIZZI
MAYER BROWN LLP
 *71 S. Wacker Drive*
 *Chicago, IL 60606*
 *(312) 782-0600*

November 10, 2016

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Stuart Newman, counsel for petitioner and a member of the Bar of this Court, certify pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) that the foregoing brief of Browning-Ferris Industries of California, Inc. doing business as BFI Newby Island Recyclery, is proportionately spaced, has a typeface of 14 points or more, and contains 13,708 words.

/s Stuart Newman
STUART NEWMAN

November 10, 2016

## CERTIFICATE OF SERVICE

I, Stuart Newman, counsel for petitioner and a member of the Bar of this Court, certify that on November 10, 2016, I caused a copy of the attached Final Brief of Petitioner/Cross-Respondent Browning-Ferris Industries of California, Inc. doing business as BFI Newby Island Recyclery to be filed with the Clerk through the Court's electronic filing system. I further certify that all parties required to be served have been served.

/s Stuart Newman
STUART NEWMAN

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

29 U.S.C. § 151 – Findings and declaration of policy..........................................A-2

29 U.S.C. § 152 – Definitions...............................................................................A-3

29 U.S.C. § 154 – National Labor Relations Board; eligibility for reappointment; officers and employees; payment of expenses......................................................A-4

29 U.S.C. § 158 – Unfair labor practices..............................................................A-4

## 29 U.S.C. § 151 – Findings and declaration of policy

The denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce by (a) impairing the efficiency, safety, or operation of the instrumentalities of commerce; (b) occurring in the current of commerce: (c) materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods from or into the channels of commerce, or the prices of such materials or goods in commerce; or (d) causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing from or into the channels of commerce.

The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects the flow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries.

Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment. or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees.

Experience has further demonstrated that certain practices by some labor organizations, their officers, and members have the intent or the necessary effect of burdening or obstructing commerce by preventing the free flow of goods in such commerce through strikes and other forms of industrial unrest or through concerted activities which impair the interest of the public in the free flow of such commerce. The elimination of such practices is a necessary condition to the assurance of the rights herein guaranteed.

It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging

the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

## 29 U.S.C. § 152 – Definitions

When used in this subchapter –

….

(2) The term "employer" includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization.

(3) The term "employee shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined.

….

(11) The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

….

A-3

(13) In determining whether any person is acting as an "agent" of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.

## 29 U.S.C. § 154 – National Labor Relations Board; eligibility for reappointment; officers and employees; payment of expenses

(a) Each member of the Board and the General Counsel of the Board shall be eligible for reappointment, and shall not engage in any other business, vocation, or employment. The Board shall appoint an executive secretary, and such attorneys, examiners, and regional directors, and such other employees as it may from time to time find necessary for the proper performance of its duties. The Board may not employ any attorneys for the purpose of reviewing transcripts of hearings or preparing drafts of opinions except that any attorney employed for assignment as a legal assistant to any Board member may for such Board member review such transcripts and prepare such drafts. No administrative law judge's report shall be reviewed, either before or after its publication, by any person other than a member of the Board or his legal assistant, and no administrative law judge shall advise or consult with the Board with respect to exceptions taken to his findings, rulings, or recommendations. The Board may establish or utilize such regional, local, or other agencies, arid utilize such voluntary and uncompensated services, as may from time to time be needed. Attorneys appointed under this section may, at the direction of the Board, appear for and represent the Board in any case in court. Nothing in this subchapter shall be construed to authorize the Board to appoint individuals for the purpose of conciliation or mediation, or for economic analysis.

….

## 29 U.S.C. § 158 – Unfair labor practices

(a) UNFAIR LABOR PRACTICE BY EMPLOYER It shall be unfair labor practice for an employer –

….

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: ….

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: ….

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title ….

(b) UNFAIR LABOR PRACTICES BY LABOR ORGANIZATION It shall be an unfair labor practice for a labor organization or its agents –

….

(4)

(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(A) forcing or requiring any employer or self employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e);

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title :

Provided,

That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

(C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class

A-5

rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:

Provided,

That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter:

Provided further,

That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution;

….

(d) OBLIGATION TO BARGAIN COLLECTIVELY For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: ….